**Robert J. ARKIN, Petitioner,**

v.

**Floyd G. BENNETT, Jr., Superintendent, Elmira Correctional Facility Respondent.**

No. 02 Civ. 1184(VM).

United States District Court, S.D. New York.

Sept. 8, 2003.

Robert J. Arkin, Elmira, NY, pro se.

### DECISION AND ORDER

MARRERO, District Judge.

A New York State Supreme Court jury in New York County convicted Robert J. Arkin ("Arkin") of four counts of first-degree robbery, for which he is serving 40 years to life in prison. Arkin, proceeding *pro se*, petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254. Arkin contends that he is in custody in violation of numerous provisions of the United States Constitution. Respondent Floyd G. Bennett, Jr. (the "State"), superintendent of the New York State correctional facility where Arkin is incarcerated, opposes the petition. For the reasons set forth below, the petition is DENIED.

## I. BACKGROUND [1]

### A. THE ROBBERIES

Viewing the facts in the light most favorable to the jury's verdict, the trial record establishes the following evidence as the basis for Arkin's conviction. Arkin committed four separate robberies of Manhattan businesses at gunpoint in December 1995 and March 1996. On December 5, 1995, Arkin robbed the Bridge Bar just as it opened at 5:00 p.m. Frank Fioravonti ("Fioravonti"), a bartender at the Bridge Bar, had just unlocked the doors and was the only other person in the bar. Arkin pointed a firearm at Fioravonti, who then handed Arkin $289 from the register. Arkin ordered Fioravonti to get down on the floor behind the bar, and then Arkin fled. Fioravonti described the robber as a very thin, five-feet-five-inch white man, around age 50, with dark brown and gray hair.

---

**1.** The factual summary is derived from the trial transcript and suppression hearing transcript. *See People v. Arkin*, Indict. 3131/96 (Supreme Court of New York, Part 75, Jan. 8–10, 1997) ("Hearing Tr."); *People v. Arkin*, Indict. 3131/96 (Supreme Court of New York, Part 61, May 7, 1997) ("Trial Tr."). No further citation to these sources will be made, except where indicated.

On December 19, 1995, Arkin robbed the Shakespeare & Company bookstore. The store's manager, Delia Kurland ("Kurland"), noticed that Arkin had been loitering in the store for a long time. Eventually, Arkin approached Kurland at her register and asked if she was the manager. When she indicated that she was, he pulled a gun and asked her to empty the register. Kurland testified at trial that, although she was unfamiliar with guns, Arkin's gun appeared very light and she believed it may have been fake. Kurland gave him the money in the register and Arkin exited the store. According to Kurland, the robber was a 120 to 125–pound white man in his mid-forties, five-feet-six to five-feet-seven inches tall, with short brown hair and a Van Dyke style beard.

On March 2, 1996, Arkin robbed the Tool Box Bar just before it opened for the evening. Arkin pointed a gun at bar employees Joseph Guarneri ("Guarneri"), Ronnie Linquist ("Linquist"), and Frank Zarcone ("Zarcone"). Arkin asked Zarcone to open the register, and then Arkin made the three men go into the bathroom. When the men emerged five minutes later, Arkin had fled with the money in the register. Linquist described the robber as a very thin, five-feet-five or five-feet-six-inch white man with a slight beard.

Arkin returned to the Bridge Bar on March 4, 1996. Again, just as the bar was opening, Arkin came into the bar and pointed a gun at Fioravonti. Arkin said, "It's me again" and demanded money. As before, Arkin made Fioravonti get down behind the bar, and Arkin fled.

### B. THE INVESTIGATION AND LINE-UP

Police Officer Daniel Mulvey ("Officer Mulvey"), a member of the 19th Precinct's Robbery Identification Program, was assigned to investigate the Shakespeare & Company robbery. Police Officer Christopher Horne ("Officer Horne"), a member of the Manhattan Robbery Squad, was assigned to the bar robberies.

Shortly after the Shakespeare & Company robbery, Officer Mulvey showed Kurland sixty to seventy photographs of potential suspects. She stated that she got a "weird feeling" from a 1991 photo of Arkin, but did not positively identify him as the robber.

On March 14, 1996, after the other robberies, Officer Mulvey showed Kurland six more photos. She positively identified Arkin's photo, which had been taken earlier that day. The same day, Officer Horne took the six photos to the Bridge Bar to show Fioravonti, but he was unable to identify the robber. At some point, Officer Horne also showed a photo array to Zarcone, and he was also unable to identify the robber.

On April 2, 1996, Officers Mulvey and Horne conducted a lineup with four of the witnesses: Kurland, Guarneri, Linquist, and Fioravonti. All but Linquist identified Arkin as the robber.

### C. ARKIN'S ALLEGED CONFESSIONS

After the lineups, the police placed Arkin in a holding cell. That night, Officer Horne entered Arkin's cell to take a photo of him. Officer Horne asked Arkin if Arkin knew him (Horne). When Arkin asked if he should know Officer Horne, Officer Horne told Arkin to "think about it." Officer Horne believed Arkin would recognize his name as the police contact on a "wanted" flyer, which had been placed in gay bars around Manhattan. Officer Horne believed Arkin to be involved in a string of gay bar robberies which were the subject of that flyer.

Officer Horne exited the cell, but Arkin called him back and said, "Oh yes, I remember you. You're the guy in the news-

paper. I want to tell you something funny." Arkin told Officer Horne that, while riding the subway, he read an article about a robbery when he suddenly realized the article was about one of his own robberies.

About fifteen minutes later, Officer Mulvey walked by the cell and Arkin asked him, "You think this will make the news?" Officer Mulvey replied that it would probably make the news. Arkin then recounted the same incident as he had told Officer Horne: "Funny, I was on the subway the other day, I'm reading the newspaper and I see this thing on gay bar robberies and I turn the page and I said, oh shit, they are talking about me and I turned it back and I read the article and I still had the hat on and I looked around and took the hat off and put it under my arm."

## D. *THE SUPPRESSION HEARING*

Before trial, Arkin's counsel successfully moved for a hearing to determine whether to suppress evidence of the lineup identifications and whether to suppress evidence of Arkin's statements to Officers Horne and Mulvey. After hearing testimony from the officers and one defense witness, the trial court suppressed evidence of Arkin's statement to Officer Horne because the exchange was the "functional equivalent of interrogation," and Arkin had not been read his Miranda rights.

The court held that he statement to Officer Mulvey was admissible, however, because it was spontaneous.

## E. *THE TRIAL*

At trial, Kurland, Fioravonti and Guaneri identified Arkin as the man who had robbed them. They also testified about their previous lineup identifications.

The trial judge refused to permit the defense to question Officer Horne about the fact that Linquist – who did not testify

at trial – had failed to pick out Arkin from the lineup. Officer Mulvey testified about his exchange with Arkin in the holding cell.

The defense, through cross-examination, attempted to call into question the witnesses' reliability and to emphasize that the police failed to gather any fingerprints. For the defense case-in-chief, Laura Fenn, who had been present for the lineups as Arkin's attorney, testified that Fioravonti's identification had been hesitant. She testified that Fioravonti said, "[t]entatively" and in a "[d]rawn out" manner, "I think – it looks like number two [Arkin]." Fenn testified that the presiding officers immediately began lowering the shutter to cover the panel. Then, according to Fenn, Fioravonti said, "But, wait, I'm not sure." Fenn testified that when the officers opened the shutters again, Fioravonti confirmed his identification of Arkin.

The jury convicted Arkin of four counts of first-degree robbery and he was sentenced to 40 years to life in prison.

## F. *THE STATE APPEALS PROCESS*

Arkin raised five issues on direct appeal: (1) that the lineup was unduly suggestive because Arkin was the only participant matching the witnesses' descriptions; (2) that Arkin's statement to Officer Mulvey should have been suppressed; (3) that the evidence was insufficient with respect to the Shakespeare & Company robbery because Kurland believed the gun to be fake; (4) that trial counsel was ineffective for (i) failing to raise the fake-gun issue and for (ii) failing to point out that Fioravonti could not identify Arkin from a photo array just weeks before the lineup; and (5) that the forty-year sentence was excessive. The state appeals court rejected, virtually summarily,[2] all of these claims. *People v. Arkin*, 270 A.D.2d 142, 706 N.Y.S.2d 321

---

**2.** The court disposed of Arkin's five non-frivo- lous claims in twelve sentences. *See Arkin,*

(App. Div. 1st Dep't 2000). It held that "the lineup was not impermissibly suggestive" because "there was sufficient resemblance between defendant and the other participants in the lineup." *Id.* at 321. Arkin's argument about suppressing Officer Mulvey's statement was unpreserved for appeal; in any event, the court held it "clearly spontaneous." *Id.* Arkin's challenge to the sufficiency of the evidence relating to the Shakespeare & Company count was likewise held to be unpreserved and, in any event, meritless. *Id.* Finally, the state appeals court concluded that Arkin received meaningful representation and a permissible sentence. *Id.* The New York Court of Appeals denied Arkin's application for leave to appeal on June 16, 2000. *See People v. Arkin,* 95 N.Y.2d 832, 713 N.Y.S.2d 138, 735 N.E.2d 418 (2000).

In February 2001, Arkin applied to the Appellate Division for a writ of error *coram nobis* on the ground that his appellate counsel was ineffective. His eighteen points of error fell into three broad categories. He argued that appellate counsel should have: (1) challenged the trial court's evidentiary ruling prohibiting Officer Horne from testifying to the fact that Linquist failed to identify Arkin in the lineup; (2) added additional grounds to the lineup identification challenge; and (3) added several more grounds to the argument that trial counsel was ineffective. Arkin's application was summarily denied. *See People v. Arkin,* 289 A.D.2d 1101, 735 N.Y.S.2d 860 (App. Div. 1st Dep't 2001).

In this habeas petition, Arkin initially raised twenty-three points: the same five points raised on direct appeal, plus the same eighteen points raised in his *coram nobis* application. In a subsequent filing, Arkin dropped his challenges to the sufficiency of the evidence and to the length of his sentence. The Court addresses his remaining contentions below.

706 N.Y.S.2d at 321–22.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Generally speaking, a petitioner is entitled to habeas relief if he can show he is in custody in violation of the United States Constitution or federal law. *See* 28 U.S.C. § 2254(a). The purpose of federal habeas review of state court convictions is to "assure that when a person is detained unlawfully or in violation of his constitutional rights he will be afforded an independent determination by a federal court of the legality of his detention, even though the issue may already have been decided on the merits by a state tribunal." *United States ex rel. Radich v. Criminal Court of New York,* 459 F.2d 745, 748 (2d Cir.1972).

The petitioner must demonstrate that he is in custody because of a state court decision which was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

On habeas review, a "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### B. *SUGGESTIVENESS OF THE LINE-UP*

Arkin argues that the lineup was unduly suggestive, in violation of the Due Process

Clause, because he was the only person to fit the description of the robber. Witnesses uniformly described a very thin, short, bearded white man, but the "fillers," according to Arkin, were all heavier and taller than him, and they did not wear beards. The only person in the lineup Arkin alleges was close to was height and weight was Wilfredo Benitez, a Hispanic man.

■■■ Evidence of an out-of-court identification violates due process if the identification procedures were so suggestive as to raise "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).[3] Courts must make this determination by looking at the "totality of the circumstances." *Id.* at 196, 93 S.Ct. 375 (quoting *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). In *Foster v. California,* 394 U.S. 440, 441, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), for example, the suspect was six or seven inches taller than the other lineup participants and was wearing a leather jacket similar to that reportedly worn by the robber. When the witness nevertheless was unable to identify the suspect, the police arranged a second lineup in which the suspect was the only person who had participated in the first lineup. *Id.* at 441–42, 89 S.Ct. 1127. These procedures "made it all but inevitable"

that the suspect would be identified, and the Supreme Court reversed his conviction. *Id.* at 443, 89 S.Ct. 1127; *see also United States ex rel. Cannon v. Smith,* 527 F.2d 702, 703–04 (2d Cir.1975) (defendant one of, at most, two participants wearing a green shirt, which is what witnesses described perpetrator as wearing); *United States v. Fernandez,* 456 F.2d 638, 641 (2d Cir.1972) (defendant was the only light-skinned black man with an afro hairstyle and surveillance photos showed those to be the robber's distinctive characteristics).

■■ The record in this case contains photographs, which the Court has examined, of the lineup participants, from which it is plain that the lineup was not impermissibly suggestive. All of the filler participants were light-skinned men with graying hair, ranging in height from five-feet eight to five-feet ten inches tall (Arkin is five-feet seven). Three of the fillers had a slim build and a thin face. Arkin is correct that the filler most resembling his height and weight was Wilfredo Benitez, who has a Hispanic surname. However, the photographs demonstrate that Benitez's skin is nearly as light as Arkin's. There is no correlation between Benitez and his Hispanic origins that would render it unremittingly improper to include him in a lineup with Arkin on that basis alone.

Arkin wore a neatly-trimmed "Van Dyke" style beard (mustache plus chin whiskers) while the other fillers all wore only mustaches. Arkin's beard did not match Guarneri's or Fioravonti's initial descriptions of the robber, and so would not have been suggestive to them. Guarneri

---

**3.** Even if pretrial procedures have been unduly suggestive, a court may admit in-court identification testimony if the court determines it to be independently reliable. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Jarrett v. Headley,* 802 F.2d 34, 42 (2d Cir.1986). In determining whether there was a likelihood of misidentification, courts look to the following

factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil,* 409 U.S. at 199–200, 93 S.Ct. 375.

described the robber as "scraggly–like he hadn't shaved in maybe a day or two" and Fioravonti said he had "more than a five o'clock shadow."

Kurland described the robber as having a Van Dyke beard, so the lineup composition may have been somewhat suggestive as to her. However, the Court notes that the Van Dyke style and the mustache style look reasonably similar, and that, in considering the "totality of the circumstances," *Neil,* 409 U.S. at 196, 93 S.Ct. 375, this isolated similarity fails to raise "a very substantial likelihood of irreparable misidentification." *Id.* at 198, 93 S.Ct. 375. Moreover, the Court notes that approximately 14 days elapsed between the robbery of the Bridge Bar on December 5, 1995 and that of the Shakespeare & Company on December 19, 1995, and subsequently approximately three months more until the lineup on April 2, 1996. It is not inconceivable that during that time Arkin's facial hair appearance may have changed, accounting for any difference in the descriptions of witnesses who actually may have seen Arkin during various intervening times.

The Court agrees with the Appellate Division's determination that "there was sufficient resemblance between defendant and the other participants in the lineup." *Arkin,* 706 N.Y.S.2d at 321. In any event, the Appellate Division's conclusion was far from an "unreasonable application," 28 U.S.C. § 2254(d), of Supreme Court precedent. *See Williams,* 529 U.S. at 404–05, 120 S.Ct. 1495. Arkin is not entitled to habeas relief on this ground.

## C. *SUPPRESSION OF EVIDENCE*

Arkin argues that his statement to Officer Mulvey should have been suppressed because he made the statement just fifteen minutes after the impermissible interrogation from Officer Horne. Arkin characterizes the two statements as part of a continuous chain of evidence, all of which should have been suppressed.

■ Arkin is apparently relying on a line of jurisprudence beginning with *Westover v. United States,* a companion case to *Miranda* itself. *See Miranda v. Arizona,* 384 U.S. 436, 494, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[4] In *Westover,* without

---

**4.** The Court uses the term "apparently" because Arkin incorporates his direct appeal brief by reference. In that brief, not surprisingly, he cites principally to New York State cases. On habeas review, however, the Court must determine whether Arkin is in custody in violation of *federal* law or the *United States* Constitution. 28 U.S.C. § 2254(a). For most purposes of this petition, the New York cases Arkin cites sufficiently track federal constitutional law, such that the Court can recognize Arkin's federal claims. On the issue of *Miranda* warnings and the right against self-incrimination, however, there is at least some divergence between New York constitutional law and federal constitutional law. *See People v. Bethea,* 67 N.Y.2d 364, 368, 502 N.Y.S.2d 713, 493 N.E.2d 937 (N.Y.1986) (recognizing that the State constitutional rule may be different from the federal rule). The Court notes that, unfortunately, the State has responded to many of Arkin's claims by also

attempting to incorporate by reference previous filings – specifically, its response to Arkin's *coram nobis* application in New York State court. The Court holds the State to a higher briefing standard than this *pro se* petitioner, and the State is admonished from, in the future, incorporating previous filings. The standard of review for a New York State *coram nobis* application is different from that of a federal habeas petition, and, in this regard, the State's attempt at incorporation by reference is not fully responsive to Arkin's petition, leaving the Court to fill in the blanks. More generally, the Court notes that "incorporation is a pointless imposition on the court's time. A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record." *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir.1999). Finally, as is the case here, the practice of incorporation by reference can skirt the Court's page limitations.

informing robbery suspect Carl Westover of his rights, Kansas City police interrogated him for several hours. *Id.* at 494–95, 86 S.Ct. 1602. Three FBI agents then continued the interrogation in an interview room in the Kansas City Police Department. *Id.* Although the FBI informed Westover of his right to counsel and his right to remain silent, Westover confessed soon after the FBI took over. *Id.* The Supreme Court reversed Westover's conviction because, in this "continuous period of questioning," *id.* at 496, 86 S.Ct. 1602, "the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation." *Id.* at 497, 86 S.Ct. 1602.

The *Westover* Court cautioned that the result might be different if Westover had been "removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." *Id.* at 496, 16 L.Ed.2d 694; *see also Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (failure to initially give *Miranda* warnings did not bar admissibility of later confession, which was preceded by careful admonition and waiver of *Miranda* rights); *Vasquez v. Senkowski,* 54 F.Supp.2d 208 (S.D.N.Y.1999) (same).

 Arkin makes much of the fact that his conversation with Officer Mulvey took place within fifteen minutes of his conversation with Officer Horne. This fact, he contends, demonstrates that the conversations were actually part of one single interrogation. This argument misses the more fundamental question of whether the conversation with Officer Mulvey was even an interrogation at all.

 The *Miranda* safeguards only . "come into play whenever a person in custody is subjected to either express ques-

See *Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir.1993) (declining to review issues incorpo-

tioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In determining whether there was an interrogation, courts look for "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301, 100 S.Ct. 1682 (emphasis in original).

Here, however, the trial court found that Arkin initiated the exchange with Officer Mulvey, and the state appellate court determined that Arkin's statement was "clearly spontaneous." *People v. Arkin,* 706 N.Y.S.2d at 321. In other words, there was no interrogation at all, for *Miranda* purposes, and thus the *Westover* line of cases, involving police-initiated interrogations, is inapposite.

Arkin has not argued that his statement was not spontaneous, much less offered "clear and convincing" evidence to rebut the presumption that the State court's factual determination in this regard is correct. *See* 28 U.S.C. § 2254(e)(1). Thus, accepting as true that Arkin initiated the exchange with Officer Mulvey, the Court concludes that the *Miranda* safeguards are not implicated and that Arkin is not entitled to habeas relief on this ground.

## D. *INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL*

Bridge Bar robbery victim Fioravonti failed to identify Arkin in a photo array on March 14, 1996, but was able to pick Fioravonti out of a lineup a few weeks later, on April 2. Trial counsel failed to cross-examine Fioravonti about the photo array, and Arkin contends that this fact demonstrates that he received ineffective assistance of counsel. Arkin hypothesizes that counsel

rated by reference where the brief had already reached the page limit).

could have undermined Fioravonti's lineup and trial identifications by pointing out to the jury that Arkin was the only person in both the photo array and the lineup. The State concedes that trial counsel made a mistake in failing to pursue this line of questioning, but contends that the isolated error falls short of ineffective assistance of counsel.

 To obtain habeas relief on the ground that counsel was ineffective, the petitioner must show (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In determining whether the performance was deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. In determining whether there was prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

 After reviewing the record, the Court notes that, in general, trial counsel very competently defended Arkin. Before trial, counsel successfully moved the court to suppress evidence of Arkin's alleged confession to Officer Horne. At trial, the police officers, on counsel's cross-examination, conceded that there were no fingerprints or other physical evidence linking Arkin to the crimes. As counsel stated in closing, the police "didn't lift a finger to look for fingerprints."

Counsel's cross-examination of the victims emphasized that they saw the robber only briefly and under stressful circumstances. Counsel called into question the lineup identifications by noting that the Arkin was the only person matching the witness' descriptions, and by pointing out that the lineup took place several weeks, or in some cases months, after the robberies. A defense witness who was present during the lineups testified that Fioravonti's identification was very hesitant.

Counsel also sought to cast doubt on whether it was plausible that Arkin would confess to Officer Mulvey. On cross-examination, Officer Mulvey admitted that he did not attempt to get Arkin to sign a statement affirming the alleged confession and that he had had only minimal interactions with Arkin before Arkin suddenly blurted out a confession. Finally, counsel told the jury in closing that "everyone knows where the defendant stands or sits in the courtroom," endeavoring to cast doubt on the witnesses' in-court identifications.

Even though counsel apparently erred in failing to cross-examine Fioravonti about the photo array, counsel was otherwise very thorough in cross-examining Fioravonti. The defense even put forth its own witness who testified that Fioravonti's identification had been very hesitant.

The Court agrees with the Appellate Division's conclusion that "defendant received meaningful representation." *Arkin,* 706 N.Y.S.2d at 321. The isolated error of failing to counter Fioravonti's strong testimony with an account of the photo array does not make counsel's performance fall outside the "wide range of reasonable assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

The Court also notes that two other witnesses with clear views of the robber identified Arkin with certainty, and that a police officer testified to an apparent confession. On direct examination Fioravonti testified that he had clear view of the robber – who apparently never tried to conceal his face during any of the robberies – and Fioravonti stated he was certain that Arkin was the robber.

The Court concludes that there is no reasonable possibility that the outcome of the trial would have been different had defense counsel pursued this additional line of cross-examination against Fioravonti. Therefore, Arkin's incarceration is not the result of an "unreasonable application," 28 U.S.C. § 2254(d), of the *Strickland* standard, and Arkin is not entitled to habeas relief on this ground.

### E. *INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL*

 Arkin's remaining eighteen claims challenge the effectiveness of his appellate counsel. The standard for effective assistance of appellate counsel is the *Strickland* standard, explained above. *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). To demonstrate a deficient appellate performance, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made.... However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Id.*

The Court notes at the outset that, in general, Arkin's appellate brief was very well-written and researched, and raised five nonfrivolous arguments on Arkin's behalf.

 Tool Box Bar robbery witness Ronnie Linquist failed to identify Arkin in a lineup. For reasons not apparent in the record, Linquist did not testify at trial. Defense counsel sought to cross-examine Officer Horne about Linquist's failed lineup identification as a means to impeach the positive identification of another Tool Box Bar robbery witness, Joseph Guarneri. The trial court refused to allow the questioning. Arkin argues that the trial court

prevented him from presenting Linquist's testimony in violation of his Sixth Amendment right to compulsory process, and that appellate counsel was deficient for failing to raise this point on appeal.

Arkin is correct that the Sixth Amendment gives a defendant the right to "have compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, but he misrepresents what happened at trial. The trial court in no way prevented him from calling Linquist; it merely determined that Officer Horne would not be allowed to present evidence that is classically hearsay: evidence as to what Linquist said out of court for the purpose of proving the truth of Linquist's assertion. *See, e.g., People v. Huertas,* 75 N.Y.2d 487, 491–92, 554 N.Y.S.2d 444, 553 N.E.2d 992 (N.Y.1990) (defining hearsay). In fact, the prosecution stated it would not object to the defense calling Linquist as a witness. Thus, the trial court did not deny Arkin his right to compulsory process.

Because the underlying claim is meritless, appellate counsel was not deficient for failing to raise the claim.

 Arkin argues that, in addition to the other grounds appellate counsel mentioned in the brief, appellate counsel should have challenged the lineup identifications as unduly suggestive on the ground that Arkin was the only lineup participant required to wear a jacket, a feature corresponding to the witnesses' descriptions.

Arkin is correct that, as explained in Part II.B, a lineup that cues the witness to a unique characteristic can be unduly suggestive, but, again, he is mistaken on the facts. Kurland described the robber as having a "big long gray coat," and Fioravonti described a "dark blue or black ... three-quarter ski jacket" that extended down to "[s]omewhere around the thighs." A police report shows that Guarneri described the robber as wearing a "dark

brown 3/4 jacket." For the lineup, Arkin was wearing a black, lightweight, waist-length hooded jacket. Because the jacket Arkin was wearing did not correspond to the witness' descriptions of the robber, it was not unduly suggestive. The Court notes additionally that there is no evidence in the record that the police made Arkin wear the jacket.

Arkin also contends that the presence of Arkin's then-attorney Laura Fenn was unduly suggestive because it indicated that there was an actual suspect in the lineup. However, the Second Circuit has held that an otherwise fair identification procedure does not become unduly suggestive merely because the witness knows the police have a suspect. *Styers v. Smith*, 659 F.2d 293, 297 (2d Cir.1981) (citing *United States v. Danzey*, 594 F.2d 905, 915–16 (2d Cir. 1979)).

In conjunction with the conclusion from Part II.B, the Court concludes that, under the totality of the circumstances, there was not "a very substantial likelihood of irreparable misidentification," *Neil*, 409 U.S. at 198, 93 S.Ct. 375, and therefore the claim has no merit. Appellate counsel was therefore not deficient in not raising the issue.

■■■ Arkin argues that trial counsel should have impeached various witnesses for contradictions appearing in the record. He asserts that appellate counsel was deficient for not raising these issues in the argument for ineffective assistance of trial counsel.

Four of these points involve purported contradictions in the victims' testimony. First, a police report shows Fioravonti said the robber was clean shaven, even though at trial, Fioravonti said the robber had "more than a five o'clock shadow, but less than a beard." Second, Guarneri testified at trial that the robber was "scraggly," yet a police report based on a Guarneri interview indicates that the robber was clean

shaven. Third, that report indicates that Guarneri said the robber's eyes were "blue/green," even though Arkin's eyes are brown. Fourth, Kurland testified at trial that the robber had "sort of washed out blondish light brown hair cut very short"; Arkin asserts his hair is "chestnut brown."

Three of the four "contradictions" are dubious. Fioravonti and Guarneri both described a person who does not normally wear a particular style of beard, which likely explains why the police wrote "clean" under the box for "facial hair" in the police report. The lineup photograph of Arkin shows that Kurland's description of "washed out blondish light brown hair" is fairly accurate, and in any event, not too far astray from "chestnut brown."

■■■ More importantly, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir.2002) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987)). The record shows that trial counsel thoroughly cross-examined the witnesses on their ability to focus on the robber's face, and on their ability to recall that face months later. The Court will not second-guess trial counsel's decision not to pursue these other more minor avenues of impeachment.

Arkin also points out that Officer Horne stated at the suppression hearing that he had never shown Guarneri a photo array, even though, according to Arkin, a police report indicates that Officer Horne did show Guarneri a photo array. Arkin claims that trial counsel should have impeached Officer Horne with this contradiction. Again, the contradiction is dubious. The police report states that Officer Horne "did show the photo array to witnesses in this case," though it is unclear

from that statement whether Officer Horne showed the array to Guarneri in particular. In any event, as explained above, this question of cross-examination strategy will not support an ineffective assistance of counsel claim. *See id.*

Arkin highlights a portion of Officer Mulvey's testimony in which he indicated he did not have "anything to do with Officer Horne or his witnesses." According to Arkin, this contradicts a police report showing that Officers Horne and Mulvey worked together in showing witnesses photo arrays, and Arkin asserts that counsel should have impeached Officer Mulvey on this point. Arkin again misrepresents the record. Officer Mulvey's testimony was part of a line of questioning about the lineups, and it is apparent from the context of the examination that, *at the lineup*, he had nothing to do with Officer Horne's witnesses. As explained above, the Court will not fault trial counsel for failing to pursue specific avenues of cross-examination, especially when those avenues are very weak. *See id.*

With respect to the impeachment issues, Arkin's assertions of ineffective assistance of trial counsel are meritless, and the Court concludes that appellate counsel was not deficient in failing to raise the issues.

Arkin alleges that trial counsel showed a lack of diligence in various respects, and that appellate counsel should have highlighted these errors as grounds for the ineffective assistance of trial counsel claim.

■ Arkin argues that counsel's failure to call witness Frank Zarcone, who did not identify Arkin from a photo array, demonstrates that counsel was ineffective. The record does not indicate how Zarcone would have testified, nor does it indicate why he did not testify. Thus, Arkin has not overcome the "strong presumption," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, that counsel's decision was part of his trial strategy. The Second Circuit has empha-

sized that a court "will practically never second-guess" an attorney's decision to present or withhold a witness. *See United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir.1974).

■ Arkin next argues that trial counsel should have continued to pursue a particular line of cross-examination with Fioravonti. In the following exchange, trial counsel was apparently trying to underscore that Fioravonti's testimony would be markedly different than that of forthcoming defense witness Laura Fenn:

Q: Before you were able to finish saying that it was number two, did an officer begin to close the shade?

A: No.

Q: The officer neither closed the shade, nor did you ask the officer to hold it a moment and open the shade back up; is that your testimony, Mr. Fioravonti?

A: I didn't say that.

Q: So, that's not your testimony; correct?

A. Correct.

Trial Tr. at 210. Trial counsel then moved on to another subject. Arkin faults trial counsel for failing to pursue the details of Fioravonti's identification, and speculates that Fioravonti's testimony may have been impeached had trial counsel continued. The Court disagrees. Even assuming that Fioravonti may have somehow eventually undermined, rather than reinforced, his earlier testimony, this type of hindsight analysis over minor strategic decisions cannot be the basis of an ineffective assistance of counsel claim. *See Dunham*, 313 F.3d at 732.

■ Arkin next argues that trial counsel was deficient for failing to argue, either orally or in writing, for the suppression of the lineup evidence or for the suppression of Arkin's statement to Officer Mulvey. This allegation is misleading. Arkin's

counsel made a pre-trial motion arguing, among other things, that this evidence be suppressed. The motion sought, in the alternative, a hearing to determine whether the evidence should be suppressed. The trial court granted a hearing, during which trial counsel thoroughly cross-examined Officers Mulvey and Horne on these precise issues, and trial counsel offered the testimony of Laura Fenn in support of his motion. Through these efforts, trial counsel successfully suppressed evidence of Arkin's statement to Officer Horne.

However, Arkin directs the Court's attention to a portion of the record in which trial counsel successfully requested to file additional written motion papers after the suppression hearing, and Arkin states that trial counsel never filed those papers. The Court could find no evidence in the record of a written motion filed after the suppression hearing. Assuming, therefore, that trial counsel never filed a separate post-hearing motion, the Court nevertheless concludes that Arkin was provided effective assistance of counsel in this regard. Trial counsel formally moved to suppress the evidence in a pre-hearing omnibus motion, and trial counsel ably pressed the relevant points during the hearing itself.

In any event, as explained more fully in Parts II.B and II.C above, Arkin has failed to show that there is any merit to the arguments he asserts counsel should have made in a separate post-hearing motion. Therefore, he has failed to demonstrate he was prejudiced by the alleged deficiency.

■■■ Arkin next argues that trial counsel was deficient for failing to pursue a witness to the Shakespeare & Company robberies. Kurland testified that a customer, who happened to reside in the same building as the bookstore, witnessed the robbery and went out the rear entrance to call the police. Arkin first faults trial counsel for not obtaining the tape recording of the witness' call to police. The record shows, however, that, by the time criminal proceedings were instigated, there were no longer any 911 tapes reporting that robbery. Arkin speculates that this witness would have helped his case, instead of further inculpating him, and faults trial counsel for failing to find her. Because his assertion rests on speculation, the Court concludes that Arkin has not carried his burden to demonstrate that trial counsel's performance was deficient, nor has he shown that the alleged deficiency caused him prejudice, given the sufficient independent bases and evidence on the record to support his conviction.

■■■ Arkin next faults trial counsel for failing to object at two points during the trial. First, the prosecutor stated in summation that Kurland "thought there was something like a Van Dyke" beard on the robber. Since Kurland's testimony was definitive – she stated the robber *did* wear a Van Dyke – Arkin argues that trial counsel should have objected to this phrase as a mischaracterization of the testimony. Arkin argues that the prosecutor's phrasing might suggest that the robber was clean shaven. And, since Arkin was clean shaven for trial, Arkin argues that the jury was more likely to vote to convict him.

This argument is frivolous. It would be bizarre to conclude from the prosecutor's phrasing that the robber was clean shaven at the time of the crimes, and even more bizarre for a rational juror to make any relevant connection between the fact that the robber may have been clean shaven in March 1996 and the fact that Arkin was clean shaven at his May 1997 trial.

Second, Arkin argues that trial counsel should have objected to the following jury instruction containing an apparent misstatement:

> The defendant has no burden to prove that he did not make the statement.

The burden of proof to establish that the defendant did make the statement is on the People, and *the defendant must prove that fact to your satisfaction beyond a reasonable doubt.*

Trial Tr. at 404 (emphasis added). Arkin argues that this statement shifted the burden of proof to the defendant. The Court disagrees. In context it is apparent that the trial court misspoke. Immediately after this isolated error, the trial court corrected the misstatement, asserting, "If the People fail to prove beyond a reasonable doubt that the defendant, in fact, made the statement, you must, in arriving at your verdict, disregard the statement as though it had never been admitted into evidence." *Id.* Several times in the jury instructions the court reemphasized that the burden of proof "is always on the People." *Id.* at 412. The Court considers the instructions as a whole and "juries are presumed to follow their instructions." *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The Court concludes that there is no reasonable likelihood that the jury misunderstood the instructions as a whole and, therefore, trial counsel was not deficient for failing to object.

The Court concludes that there is no merit to any of the Arkin's claims regarding counsel's alleged lack of diligence. Because a claim for ineffective assistance of counsel on those grounds would be meritless, appellate counsel was not deficient for failing to raise them on Arkin's appeal.

■ Arkin argues that counsel made two errors in the suppression hearing which may have changed the result. He argues that appellate counsel was deficient in failing to raise these as grounds for his ineffective assistance of trial counsel claim. First, he maintains that trial counsel should have impeached Officer Horne's credibility at the suppression hearing. Officer Horne testified that Guarneri never

viewed a photo array, but, according to Arkin, a police report shows that Guarneri did view a photo array. As mentioned above in Part II.E, this contradiction is dubious. The police report states that Officer Horne showed the photo array to "witnesses," but it nowhere states that Officer Horne showed the array to Guarneri in particular. And, as also explained above at Part II.E, these questions of cross-examination strategy, especially where the impeachment value is highly dubious, will not support a claim of ineffective assistance of counsel. *See Dunham*, 313 F.3d at 732.

Second, Arkin argues that, at the suppression hearing, trial counsel should have put forth a police report in which Guarneri indicated the robber was clean shaven. Arkin hypothesizes that, since he was wearing a Van Dyke beard at the lineup, the police report would be evidence that the lineup was unreliable and that would have changed the result of the hearing. The Court disagrees. The lineup took place one month after the Tool Box Bar robbery, so it is unremarkable that Arkin may have grown facial hair in the interim. This is especially true because Guarneri testified at trial that the robber looked "scraggly–like he hadn't shaved in maybe a day or two." Again, the Court emphasizes the broader point that these minor strategic questions will not form the basis of an ineffective assistance of counsel claim.

In sum, because these arguments for ineffective assistance of trial counsel are meritless, the Court concludes that appellate counsel was not deficient for failing to raise them.

### III. *CONCLUSION AND ORDER*

For the reasons discussed above; it is hereby

**ORDERED** that Robert Arkin's petition for a writ of habeas corpus is DENIED.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

As Arkin has failed to make a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253.